Filed 8/12/25  P. v. Gutierrez CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>         Plaintiff and Respondent,<br><br>v.<br><br>JORGE LLAMAS GUTIERREZ,<br><br>         Defendant and Appellant. | A169777<br><br>(Contra Costa County Super. Ct. No. 05001011972) |

Jorge Llamas Gutierrez (Llamas)[1] appeals from the denial of his motion under Penal Code section 1473.7,[2] seeking postconviction relief based on his asserted failure to understand the immigration consequences of his plea.  We affirm the trial court's judgment.

**BACKGROUND**

**A.**

In 2010, the United States Supreme Court held in *Padilla v. Kentucky* (2010) 559 U.S. 356, 367-369, that the Sixth Amendment right to counsel entitles criminal defendants to

---

[1] The record is inconsistent with respect to appellant's name.  We will use the name that appellant provided when he testified in the trial court, and hereafter refer to him as "Llamas."

[2] Undesignated statutory references are to the Penal Code.

1

competent legal advice about the risk of deportation associated with a guilty plea.

Our Legislature codified *Padilla*'s holding in section 1016.3, which mandates that "[d]efense counsel shall provide accurate and affirmative advice about the immigration consequences of a proposed disposition, and when consistent with the goals of and with the informed consent of the defendant, and consistent with professional standards, defend against those consequences." (§ 1016.3, subd. (a); see also § 1016.2.)

Subsequently, our Legislature enacted section 1473.7 to provide a mechanism for relief for certain noncitizens who were unaware of the immigration consequences of their criminal convictions. (§ 1473.7, subd. (a)(1).) Specifically, persons who have completed a criminal sentence may obtain vacatur of their conviction or sentence if they prove, by a preponderance of the evidence, that "[t]he conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences" of the conviction or sentence. (§ 1473.7, subds. (a)(1), (e)(1).) To prevail, defendants must establish that (1) they did not meaningfully understand the immigration consequences of their plea; and (2) they were prejudiced by that error because there is a reasonable probability that they would have rejected the plea had they properly understood the applicable immigration consequences. (*People v. Espinoza* (2023) 14 Cal.5th 311, 319 (*Espinoza*); *People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*); see also *People v. Padron* (2025) 109 Cal.App.5th 950, 958-959 (*Padron*).) The defendant need not establish ineffective assistance by defense counsel to satisfy the first element. (§ 1473.7, subd. (a)(1); *Vivar*, at p. 523.)

## B.

Llamas was born in Mexico and moved to the United States at the age of one. He married and had two children, and his entire extended family resides in the United States. Llamas graduated from high school in the United States and understands both English and Spanish. At the time of his plea, Llamas had lived in the United States for 45 years and was the primary income-earner for his family. He was a lawful permanent resident of the United States.

In 2010, Llamas was charged with 14 counts of violating section 288, subdivision (a), which prohibits committing a lewd act upon a child under the age of 14. The prosecution alleged that Llamas had regularly sexually abused his wife's daughter (from a previous relationship) over a seven year period, when the victim was between the ages of five and 11. The prosecution also maintained that Llamas had sexually abused his wife's granddaughter on three occasions when she was nine years old. The charges carried a maximum sentence of 210 years to life in prison. Ultimately, Llamas pled no contest to five counts of violating section 288, subdivision (a), and he was sentenced to 14 years in prison.

The plea form (dated March 2012) indicated that Llamas signed his initials next to a statement that "[f]ederal law provides for mandatory deportation for certain crimes. I understand that if I am not a citizen of the United States, I have the right to contact a diplomatic or consular representative of my country, and conviction of a crime could result in my deportation, denial of my re-entry to the United States and denial of my application for citizenship." Llamas's attorney, Elizabeth Barker, also signed the plea form, attesting to the statement, "I have discussed the facts of the defendant's case with the defendant, and explained the consequences of this plea." In addition, the plea form contained a certification by a Spanish language interpreter

3

attesting that the interpreter translated the form to the defendant and the defendant stated that he understood its contents.

During the plea hearing in March 2012, after Llamas entered his plea of "no contest," the trial court advised him: "Mr. Llamas, I don't know your immigration status but I want to be clear that these charges are excludable. If you currently have a green card you can be deported and you may never become a U.S. citizen if you are not one at this time. You are aware of that?"[3] Llamas responded: "I understand that." A certified Spanish language interpreter provided interpretation during the hearing.

Llamas's convictions under Penal Code section 288, subdivision (a), were aggravated felonies that made him removable from the United States and ineligible for discretionary immigration relief. (See 8 U.S.C. §§ 1101(a)(43)(A) [defining " 'aggravated felony' " to include "sexual abuse of a minor"], 1227(a)(2)(A)(iii) ["Any alien who is convicted of an aggravated felony at any time after admission is deportable."]; *United States v. Baron-Medina* (9th Cir. 1999) 187 F.3d 1144, 1147 [holding that a conviction under Penal Code section 288, subdivision (a), constitutes an aggravated felony under 8 U.S.C. § 1101(a)(43)(A)]; *Moncrieffe v. Holder* (2013) 569 U.S. 184, 187 [explaining that noncitizens convicted of aggravated felonies are ineligible for discretionary relief from removal].) As a result, after he served his sentence, Llamas was removed to Mexico, where he was residing at the time of the hearing on his Penal Code section 1473.7 motion.

---

[3] We grant Llamas's unopposed request for judicial notice of two records: the transcript from his March 5, 2012 plea hearing and a legible copy of an intake page from his criminal case file from the public defender's office. (See Evid. Code, § 452, subd. (d).)

## C.

### 1.

Llamas's evidence in support of his section 1473.7 motion[4] included his own declaration and testimony, a declaration from an attorney (Stephani Prieto) who investigated the circumstances of his plea, and letters of support from several family members attesting to his good character. The record also contained his signed plea form, the transcript from his plea colloquy, and an intake page for his case file from the public defender's office.

The intake page from Llamas's public defender file contains demographic and other information concerning Llamas; in one field apparently inquiring about the defendant's "U.S. Cit[izen]" status, the letters "USC" have been handwritten.

When Prieto's office contacted Barker, Llamas's former defense attorney, she "maintained that she did warn Mr. Llamas of the immigration consequences but could not provide additional details."

Llamas contradicted his attorney. According to his declaration, Barker never informed him that he would be "deported, denied naturalization, [or] denied reentry" if he plead to five counts of violating section 288, subdivision (a). He stated, "I do not recall Ms. Barker asking me for my immigration status." Llamas maintained that Barker was "largely absent" throughout the criminal process and made him feel that, even though he maintained his innocence, he had no other choice but to accept the plea offer. The first time Llamas understood that there were immigration consequences associated with his plea was when he learned he was being taken into immigration custody.

---

[4] Llamas also filed an unsuccessful motion for relief under section 1016.5, which concerns the trial court's duty to advise a defendant of the potential immigration consequences of his plea; Llamas does not appeal the denial of his section 1016.5 motion.

Testifying by video at the motion hearing in November 2023, Llamas reiterated that Barker, whom he spoke with in English, never asked him about his citizenship status and never spoke with him about the effect that accepting the plea offer would have on his immigration status. Nor did Llamas ever mention his immigration status to her or represent to her that he was a U.S. citizen.

Llamas testified that when he entered his plea, he was a lawful permanent resident, which he described as "mica," referring to a residency card or green card that must be presented to cross the border into the United States. At the time, he knew that his status was that he had a "mica"; he did not believe he was a United States citizen. When asked whether he was aware that a mica "was not a full citizenship status" in the United States, Llamas responded: "No. Because all my life, I lived in the United States, and I never needed [the mica]. Even when I went to work, I was never asked for my immigration status." Llamas explained that, at the time, he and his family had "a question" as to whether he might qualify as a citizen because his father was a citizen, and his father had told him " 'if I'm a citizen, you're a citizen too.' " He and his family "never understood how that worked" until he was in immigration proceedings.

According to Llamas, the only discussion about the plea Barker had with him was on the day he accepted the plea, when they spoke three times for five to 10 minutes at a time. Barker "barely" explained to him the terms of each plea offer. Llamas rejected the first two plea offers, and he asked Barker why he should take the offer when he was innocent. Ultimately, he accepted the plea after Barker explained to him that "if I took it to trial, that I would get life [in prison], and that if I took the deal, I would get out in seven years so I could restart my life." Barker did not explain to him that he would be restarting his life

6

outside the United States. If Llamas had understood that he was going to be deported, he would have rejected the plea offer.

Llamas testified that when he signed the plea form, which was in English, it was "really fast-paced" and he was told to " '[s]ign here, sign here, sign here.' " He "was signing real sloppy because [the form] was bending," so "halfway through" the signing they gave him a clipboard to sign on. Llamas never read the plea form himself and no one explained to him what the charges were or how many charges he would be pleading to. "[N]othing was explained" to him and no one read the form to him, translated it for him, or let him read it. However, on cross-examination, Llamas acknowledged that when he went over the plea form, an interpreter was interpreting the form in Spanish.

Llamas testified that although he had an interpreter the day he entered his plea, it was "confusing to have both English and Spanish at the same time while being in court." Sometimes he could not understand the interpreter because he was not Mexican; he testified, "those were Peruvian and Salvadoran interpreters, and they don't speak Spanish the way [I] speak Spanish." Subsequently, Llamas testified that the interpreter was speaking Castilian Spanish, which is spoken in Spain.

During his testimony, when the People read to him the advisal on the plea form that he had initialed, indicating that " '[f]ederal law provides for mandatory deportation,' " Llamas maintained that that was the first time he had ever heard or read that advisal. Llamas subsequently testified that the interpreter was "phrasing [things] in his own way," and said something to the effect of, " '[i]f your legal status in the United States is illegal . . . and you want to apply for a citizenship [*sic*], you may be in jeopardy.' "

Llamas also had no memory of the court advising him that if he had a green card, he could be deported, stating that he was not listening to the court but to the interpreter. Llamas did not

7

remember the interpreter translating a statement to the effect of the court's advisal. The interpreter "was interpreting it . . . in a different way." Llamas elaborated that the interpreter did not use the words " 'green card' " but instead indicated that his " 'legal status in the United States' " was "in jeopardy," and he thought the advisal only applied to undocumented immigrants. Llamas testified that during the plea hearing, "the only thing" he was thinking about was the fact that he would have to go to prison, and "eventually" he "tuned . . . out" what was being said in court.

Apart from the brief meetings the day he entered his plea, Llamas had sporadic contact with Barker during his criminal case. Llamas had trouble remembering details from his preliminary hearing.

**2.**

At the conclusion of the hearing, the trial court denied the section 1473.7 motion. The court ruled that Llamas had not proven by a preponderance of the evidence that he had an erroneous understanding as to the immigration consequences of his plea.

The court found that Llamas was not credible, stating: "I just simply do not credit his testimony regarding the lack of advisement and the lack of understanding." The court noted that Barker disputed Llamas's account that she did not advise him of the immigration consequences of his plea. The court reasoned that Barker was not called to testify and the only information from the defense file was that "USC" was written on the form from the public defender's office. The court did not credit Llamas's assertions that Barker provided minimal assistance during his criminal proceedings. The court found it implausible that Llamas could "recall in minute detail the plea process" but was unable to remember the preliminary hearing, which Barker attended with him. And the court acknowledged that the advisal

8

in the plea agreement did not satisfy Barker's duty to provide specific advice as to the immigration consequences of Llamas's plea (see § 1016.3, subd. (a); *Espinoza, supra,* 14 Cal.5th at p. 320), but the court held that the evidence was insufficient to prove that Barker had failed to advise him.

The court also found unconvincing Llamas's testimony that he received problematic interpretation. Further, the court found that his testimony about the plea form did not "make sense," noting that Llamas "had to have been close enough to see" the advisals on the form. Although Llamas asserted that his handwriting was messier before he received the clipboard, the court found that his handwriting was "very consistent throughout."

As a result, the court held, the evidence was insufficient to prove that Llamas was not advised by Ms. Barker and that he did not understand the immigration consequences of his plea.

## DISCUSSION

We independently review the denial of a section 1473.7 motion to determine whether the facts satisfy the legal standard. (See *Vivar, supra,* 11 Cal.5th at p. 527.) Under this standard, we give "particular deference" to fact findings concerning the credibility of witnesses whom the trial court " ' "heard and observed," ' " although we are not precluded from reaching a different conclusion. (*Id.* at p. 527; see also *People v. Manzanilla* (2022) 80 Cal.App.5th 891, 911 (*Manzanilla*) ["Factual determinations based on credibility are entitled to deference when they have record support."].)

## A.

Llamas contends that the trial court erred in faulting him for not submitting contemporaneous objective evidence beyond his own statements to support his claim that he did not

9

understand the immigration consequences of his plea at the time he entered it. We disagree.

The defendant must corroborate factual assertions in support of the section 1473.7 motion with objective evidence, which can include the defendant's own declaration. (*Espinoza*, *supra*, 14 Cal.5th at pp. 321-322; *Vivar*, *supra*, 11 Cal.5th at pp. 530-531.) Thus, Llamas is correct that his own statements could be sufficient to carry the burden of establishing his failure to meaningfully understand the immigration consequences of a plea.

The problem with Llamas's argument, however, is that he fails to grapple with the trial court's adverse credibility finding. A trial court is not required to accept the defendant's own testimony without further corroboration when the court finds, after hearing and observing the movant's account, that it lacks credibility. (See *People v. Garcia* (2022) 79 Cal.App.5th 1059, 1066 (*Garcia*); see also *Vivar*, *supra*, 11 Cal.5th at pp. 527-528.) Here, the trial found Llamas's testimony not credible, stating: "I don't believe his testimony." The court expressly declined to credit not only Llamas's claim that Barker did not advise him, but his assertion that he did not understand the immigration consequences. For this reason, the trial court did not err in requiring other evidence on the question of Llamas's lack of understanding of the immigration consequences.

Llamas's briefing largely fails to take issue with the trial court's adverse credibility finding. The only challenge to the court's credibility finding he raises is the argument that the court's finding that his testimony about the plea form lacked credibility "was irrelevant and immaterial" to the question whether he understood the severe immigration consequences he faced. We disagree that the accuracy of Llamas's account of his experiences and interactions the day of his plea hearing is of no moment. To the extent his testimony concerning the events

10

leading up to his plea hearing is inconsistent, inaccurate, or incomplete, it supports the court's adverse credibility finding.

The trial court declined to credit several aspects of Llamas's testimony, including his key assertion that Barker never specifically advised him that he would face deportation—an assertion Barker disputed, consistent with her attorney statement on the plea form that she advised him of the consequences of his plea. Although the public defender form included the letters "USC," Llamas introduced no evidence as to who wrote that notation or when. The court also found it implausible that Llamas was able to recall the plea process— from over 11 years earlier—"in minute detail" but struggled to recall specifics from his preliminary hearing.

Apart from his unsupported assertion that his handwriting on the plea form was messier at the beginning, other aspects of the record also suggest that Llamas's recollection of the plea process was inaccurate or incomplete. For example, Llamas asserted that no one had ever read him the advisals in the plea form, but he later acknowledged that an interpreter had interpreted the plea form for him and that he had initialed the immigration advisal. He testified that no one—including Barker—ever told him how many charges he was pleading to, but he initialed the plea form next to a statement indicating he was pleading to five counts under section 288, subdivision (a).[5] And, according to the transcript of the plea hearing, Llamas responded "Yes" when the court asked him, "Did you have this [plea] form read to you, translated in Spanish by [the interpreter]?" Llamas also asserted that the interpreter was Ecuadorian or Peruvian, but he later stated that the interpreter spoke Castilian Spanish.

---

[5] During the plea hearing, the court also asked Llamas how he plead to each of the five counts.

11

When the court warned him at the plea hearing that he could potentially be deported, Llamas responded, "I understand that," which supports Barker's assertion that she had advised him of the immigration consequences. Further, the transcript from the plea hearing reveals no apparent interruptions, delays, or other irregularities attributable to the interpretation.

Finally, the trial court also had the advantage of hearing and observing Llamas as he testified, albeit via video. We may not "second-guess factual findings that are based on the trial court's own observations." (*Vivar*, *supra*, 11 Cal.5th at p. 527; see also *Garcia*, *supra*, 79 Cal.App.5th at p. 1065; *Manzanilla*, *supra*, 80 Cal.App.5th at p. 911.)

In sum, in light of the trial court's adverse credibility finding, the court did not err in requiring additional evidence beyond Llamas's own statements to satisfy his burden.

**B.**

Llamas argues that the trial court erred in failing to consider the totality of the circumstances in determining whether he properly understood the immigration consequences of his plea. Specifically, he contends that in assessing whether he lacked a meaningful understanding, the trial court should have considered his strong ties to the United States and the fact that he is willing to go to trial if his no contest plea is vacated. Again, his contention lacks merit.

We assume, as the parties do, that the trial court must consider the totality of the circumstances in assessing whether Llamas has satisfied his burden of proving that he lacked a meaningful understanding of the impact of his plea on his immigration status. (See *People v. Curiel* (2023) 92 Cal.App.5th 1160, 1175-1176.)[6] But Llamas provides no explanation as to

---

[6] Our Supreme Court has granted review in a case raising the question whether the totality of the circumstances

how the factors he points to—his strong ties to the United States and the upshot of a successful vacatur motion—are probative of his lack of understanding at the time he entered his plea. Without more, Llamas has failed to establish error by the trial court in the circumstances here.

In some cases, strong ties to the United States might corroborate a defendant's misunderstanding where the defendant mistakenly believed he was a United States citizen (and therefore not subject to deportation). Here, however, Llamas testified that he understood that he was not a citizen at the time, and he does not argue on appeal that he mistakenly believed he was a U.S. citizen.

Post-plea conduct may also corroborate a defendant's subjective misunderstanding, such as where a defendant attempts to apply for citizenship after pleading guilty. (See, e.g., *People v. Alatorre* (2021) 70 Cal.App.5th 747, 769-770 [citing defendant's post-plea attempts to become a naturalized citizen as evidence that he failed to meaningfully understand the consequences of his plea]; see also *Manzanilla*, *supra*, 80 Cal.App.5th at p. 910 [relying on the defendant's statement at a hearing three weeks after his plea that if he was going to be deported, "he did not want the deal."].) In contrast, Llamas's willingness to face prosecution so many years later, when

_____

established that the defendant meaningfully understood the immigration consequences of the defendant's plea. (See *In re Hernandez* (Sept. 8, 2023, F076752) [nonpub. opn.], review granted Dec. 20, 2023, S282186.) We deny as unnecessary Llamas's request that we take judicial notice of the Attorney General's Supreme Court brief in this case, indicating the Attorney General's position that the totality of the circumstances must be considered in determining whether the defendant lacked a meaningful understanding of the immigration consequences of a plea. As we have noted, there is no dispute between the parties on this point.

witnesses' memories have likely faded, sheds little light on his understanding at the time of his plea.

## DISPOSITION

The judgment is affirmed.


BURNS, J.

WE CONCUR:


JACKSON, P.J.
SIMONS, J.

*People v. Jorge Llamas Gutierrez (A169777)*